# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

JAMES K. STANTON,

      Plaintiff,

                                       CASE NO. 3:07-cv-477-J-TEM

vs.

MICHAEL J. ASTRUE
Commissioner of Social Security,

      Defendant.

_____

## ORDER AND OPINION

This matter is before the Court on Plaintiff's complaint (Doc. #1) seeking review of the final decision of the Commissioner of the Social Security Administration (the Commissioner) denying Plaintiff's claim for disability insurance benefits (DIB). 42 U.S.C. § 405(g) (2006). Plaintiff filed a legal brief in opposition to the Commissioner's decision (Doc. #17, P's Brief). Defendant filed his brief in support of the decision to deny disability benefits (Doc. #19, D's Brief). Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated April 28, 2008 (Doc. #22). The Commissioner has filed the transcript of the administrative proceedings (hereinafter referred to as "Tr." followed by the appropriate page number). Upon review of the record, the Court found the issues raised by Plaintiff were fully briefed and concluded oral argument would not benefit the Court in making its determinations. Accordingly, the matter has been decided on the written record. For the reasons set out herein, the Commissioner's decision is **AFFIRMED**.

## PROCEDURAL HISTORY

In the instant action Plaintiff filed an application for DIB on January 27, 2004 (Tr. 66-69), which alleges onset of disability on January 10, 2001.  Plaintiff alleges an inability to work due to a lumbar spine injury (Tr. 77, 99).  In the Disability Report-Adult, Plaintiff stated he stopped working because his condition deteriorated to the point he could not sustain any work activity (Tr. 99).  After being denied initially and upon reconsideration (Tr. 24-25, 26-27), Plaintiff requested a hearing, which was held on April 19, 2006 in Jacksonville, Florida before Administrative Law Judge (ALJ) JoAnn L. Anderson (Tr. 881-930).  Plaintiff appeared and testified at the hearing, as did vocational expert Paul R. Nolan.

Plaintiff was represented by Mr. J. Nickolas Alexander, Jr., Esq., during the underlying administrative phase of this case (Tr. 43, 88).  On November 22, 2006, ALJ Anderson issued a hearing decision denying Plaintiff's claim (Tr. 10-23).  The Appeals Council (AC) denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner (Tr. 6-8).

Mr. J. Nickolas Alexander, Jr., continues to represents Plaintiff in this case.  The instant action was filed in federal court on June 1, 2007 (Doc. #1).  The Court has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings.

## SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ DECISION AND THE STANDARD OF REVIEW

A plaintiff is entitled to disability benefits when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to either result in death or last for a continuous period of not less that 12 months. 20 C.F.R. § 404.1505.[1]  The Commissioner has established a five-step sequential evaluation process for determining whether Plaintiff is disabled and therefore entitled to benefits.  *See* 20 C.F.R. § 404.1520; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Plaintiff bears the burden of persuasion through Step 4, while at Step 5, the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The ALJ's decision dated November 22, 2006 denied Plaintiff's claim (Tr. 10-23). At Step 1, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. 15).  ALJ Anderson found Plaintiff's date last insured for DIB to be September 30, 2004 (Tr. 16).  At Step 2, the ALJ found Plaintiff had the severe impairments of status post diskectomy at L5-S1 with subsequent fusion and revision of fusion, status post diskectomy and fusion at C5-6, and history of right knee injury (Tr. 15).   At Step 3, the ALJ found these impairments did not meet or equal, either singly or in combination with any other impairment, any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr.19).  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light work with the limitations that Plaintiff avoid working at heights, and he could occasionally climb, balance, stoop, kneel, crouch and crawl (Tr. 19).  At Step 4, the ALJ determined that Plaintiff was unable to perform any past relevant work (Tr. 22).  At Step 5, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, considering his age, education, work experience and RFC (Tr. 22).  Thus,

---

[1]All references to 20 C.F.R. shall be to the 2008 edition, unless otherwise noted.

the ALJ determined Plaintiff was not disabled within the meaning of the Social Security Act (Tr. 23).

The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of facts are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla, but less than a preponderance-- in other words, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992).

As in all Social Security disability cases, the plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments.  *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless

4

he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations.  20 C.F.R. § 404.1512(a)

The Commissioner must apply the correct law and demonstrate that he has done so.  While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the Court has not re-weighed the evidence, but has determined whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the Plaintiff is not disabled.  *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).

## BACKGROUND FACTS

Plaintiff was thirty-two (32) years old at the time of the administrative hearing.[2] Plaintiff graduated from high school with a special certificate in Marine Mechanics (Tr. 83, 888).  Plaintiff has past relevant work as a construction worker, lawn service worker/owner, marine engine mechanic, manager trainee in food service, and cashier (Tr. 78, 89, 90, 892-93, 889, 890).  Plaintiff has an extensive medical history, which is summarized below.

## MEDICAL HISTORY

---

[2]The record reflects Plaintiff was born June 30, 1973 (Tr. 66, 888).

5

**Drs. Michael Waters, M.D., and Patricia Calhoun, M.D., Baptist Health Center**

Both Dr. Waters and Dr. Calhoun treated Plaintiff at Baptist Health Center.  From August 2, 1996 to June 18, 1998, Dr. Calhoun treated Plaintiff for sinusitis, ear pain and congestion, left finger injury, and right ACL tear (Tr. 541, 551, 552, 575, 577).  Plaintiff was seen on November 25, 1997 by Dr. Waters for mid to lower back pain (Tr. 561).  Results from an exam of the thoracic and lumbar spines were normal and showed no evidence of significant scoliosis or intervertebral disc space narrowing (Tr. 498).  On June 16, 2000, Dr. Waters noted Plaintiff was having problems with anger, initial/terminal insomnia, and occasional depression (Tr. 527).  However, on April 13, 2001, Plaintiff denied having any symptoms of depression or anxiety (Tr. 513).  Results from an MRI of the lumbar spine on February 23, 2001 revealed there was some enhancing soft tissue signal material surrounding portions of the thecal sac at L5-S1 and facet joint degenerative change with hypertrophy, but there was no definite evidence of residual or recurrent disc protrusions or nerve root displacement (Tr. 471).

**Schott Chiropractic Clinic**

On December 28, 1998, Plaintiff presented to Schott Chiropractic Clinic complaining of low back pain, mid back pain, neck pain, and headache resulting from being hit by a taxi cab on December 7, 1998 (Tr. 153).  Edward H. Schott, D.C., diagnosed lumbosacral sprain/strain, occipital neuralgia, cervical sprain/strain, and thoracic sprain/strain (Tr. 151).  X-rays taken the same day demonstrated a right spinal deviation on the lateral cervical view, hypomobility occurred in flexion, the thoracic views were unremarkable and lumbar views were unremarkable (Tr. 146).  During Plaintiff's treatment by Dr. Schott from December 28, 1998 to September 11, 1999, Plaintiff had a series of pulsed ultrasound,

interferential current, spinal manipulation, intersegmental traction, and cryo/thermal modalities (Tr. 133-35, 137-52). On May 13, 1999, Dr. Schott completed a form on which his notations indicate both that Plaintiff was totally incapacitated on that date and would be reevaluated on May 14, 1999, and that Plaintiff could return to work with no limitations on May 14, 1999 (Tr. 136). On September 11, 1999, Dr. Schott signed the same form, but did not fill in any of the blanks other than to indicate he had treated Plaintiff on that date (Tr. 132).

**Dr. M. W. Kilgore, M.D., P.A.**

Plaintiff was treated by Dr. Manley Kilgore and his staff from February 24, 1999 to May 3, 2000. Plaintiff presented to Dr. Kilgore for a neurology evaluation, from which Dr. Kilgore diagnosed dorsal lumbar spine strain/sprain, concussion, and post traumatic headache (Tr. 224-26, 233-36). However, Dr. Kilgore noted Plaintiff ambulated with a normal gait and muscle strength testing throughout showed no evidence of weakness or segmental range (Tr. 225). On May 26, 1999, an MRI demonstrated degenerative disc disease at the L5-S1 level where there was left paracentral disk protrusion that was touching the left proximal S1 nerve root (Tr. 217). A CT scan of lumbar spine on October 13, 1999 showed there was no spinal stenosis but there was small disc herniation at the L5/S1 level (Tr. 203). A myelogram on the same day demonstrated a normal lumbar myelogram, no lumbar subluxation with flexion and extension maneuvers, and minimal cervical spondylosis at C5-6 (Tr. 202). A form contained in Dr. Kilgore's treatment notes indicates Plaintiff was placed at MMI and PPI with intermittent lifting of thirty pounds and no bending or stooping, however, there is neither a signature nor a date on this page (Tr. 200). On October 21, 1999, Plaintiff was at MMI and PPI but at sedentary work with no

bending, stooping, pushing/pulling, overhead work and only intermittent lifting of twenty-five pounds; however, there is no signature (Tr. 198-99). On March 10, 2000, J. Daniel, ARNP, placed Plaintiff on no work status and referred Plaintiff to Dr. Garcia-Bengochea (Tr. 191).

**Ten Broeck Hospital Jacksonville**

Plaintiff was involuntarily admitted to Ten Broeck Hospital under the Baker Act on April 13, 2000 (Tr. 188). Plaintiff admitted to taking ten (10) Lortabs and cutting his wrist on or about April 1, 1999 because he was depressed about his marital separation, but he denied being suicidal at the time of his admission (Tr. 174-79, 185). Upon discharge on April 14, 2000, Plaintiff was diagnosed with adjustment disorder with depressed mood and was given a GAF score was fifty (50) (Tr. 165).[3] On June 28, 2000, Plaintiff was readmitted to Ten Broeck Hospital under the Baker Act (Tr. 290). He was diagnosed with unspecified depression, adjustment disorder with mixed emotional features, and was in observation for bipolar affective disorder (Tr. 242). Upon admission, Plaintiff had a GAF score of 20 (Tr. 280). On June 30, 2000, Plaintiff was discharged with a GAF score of 50 (Tr. 242).

**Dr. Javier Garcia-Bengochea, M.D., Lyerly Neurosurgical Associates, P.A.**

Upon neck and lumbar spine examination of Plaintiff on May 18, 2000, Dr. Garcia-

---

[3]The Global Assessment of Functioning Scale (GAF) was designed by mental health clinicians to rate the psychological, social and occupational functioning of an individual on a mental health scale of 0-100. A GAF score of 41-50 describes "serious symptoms" and includes "serious impairment in the social, occupational or school functioning." A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning. A GAF score of 61-70 indicates "some mild symptoms," but generally functioning "pretty well, has some meaningful interpersonal relationships." A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors with no more than slight impairment in social, occupational or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, 32-34 (4th ed., American Psychiatric Assoc. 2000).

Bengochea found there was no spasm, atrophy or fasciculations in the neck or lower back (Tr. 825). This same date it was noted Plaintiff had full range of motion of his lumbar spine but did have significant pain with flexion and extension (Tr. 825). On May 24, 2000, an MRI of the lumbar spine revealed L5-S1 level broad-based disk extrusion, central and towards the left side, in close proximity with the proximal aspect of the S1 nerve root, causing mild stenosis of the medial aspect of the left neural foramen (Tr. 819). Dr. Garcia-Bengochea found there was no evidence of significant stenosis or nerve root compression after review of the May 24, 2000 MRI (Tr. 816). MRI results from November 29, 2000 were consistent with the May 24, 2000 MRI (Tr. 808).

On January 4, 2001, Dr. Garcia-Bengochea noted Plaintiff had some straight leg raising pain on the left and suggested disc decompression (Tr. 337). He diagnosed L5-S1 central and left sided herniated nucleus pulposus producing discogenic pain and possible radiculopathy (Tr. 338). On the same day, Dr. Garcia-Bengochea performed a microendoscopic diskectomy on Plaintiff with decompression at L5 and S1(Tr. 326). In a letter dated May 25, 2001, Dr. Garcia-Bengochea restricted Plaintiff to lifting no more than twenty-five (25) pounds without assistance, no repetitive bending, no prolonged sitting or standing, kneeling, crawling and no exposure to unprotected heights (Tr. 798).

On April 17, 2002, Dr. Garcia-Bengochea noted Plaintiff's back had a diminished range of motion with more pain on flexion than extension of the lumbar spine (Tr. 795).[4] Upon review of cervical and lumbar MRIs from May 9, 2002, Dr. Garcia-Bengochea

_____

[4]As discussed more fully in a following section, on February 28, 2002, Plaintiff underwent a bilateral L4-5 and L5-S1 radio-frequency lesioning, performed by Dr. Christopher Roberts  (Tr. 616).

determined Plaintiff's lumbar spine showed some degenerative disease at L5-S1 without spinal stenosis or evidence of recurrent disk herniation, while he diagnosed C5-6 disk herniation central and left-sided producing radiculopathy (Tr. 792).  Dr. Garcia-Bengochea performed an anterior cervical microdiskectomy with allograft fusion using anterior cervical plate stabilization on July 12, 2002 (Tr. 607).  On October 10, 2002, Plaintiff was admitted to Baptist Medical Center for lumbar decompression and fusion with instrumentation (Tr. 436).  Plaintiff's discharge diagnosis was severe degenerative disc disease with discogenic pain at L5-S1 status post previous lumbar laminectomy (Tr. 431).

On June 2, 2003, x-rays of Plaintiffs spine  indicated there was no subluxation in the neutral position of either the lumbar spine or the cervical spine (Tr. 778, 779).  After reviewing Plaintiff's CT scan of the lumbar spine on June 4, 2003, Dr. Garcia-Bengochea diagnosed probable pseudoarthrosis at L5-S1 producing pain (Tr. 774).  On December 1, 2003, Dr. Garcia-Bengochea performed an anterior diskectomy with osteotomies and removal of previous pseudoarthrosis at L5-S1, as well as anterior lumbar interbody fusion at L5-S1 using PEEK interbody spacer and bone morphogenic protein (Tr. 594).  Dr. Garcia-Bengochea found Plaintiff's lumbar fusion to be solid across L5-S1 without any evidence of pseudoarthrosis after reviewing Plaintiff's March 24, 2004 cervical-lumbar spine x-rays (Tr. 767-69).

On March 31, 2004, Dr. Garcia-Bengochea completed a form upon request of the Florida Department of Health-Division of Disability Determinations on which he indicated he did not feel Plaintiff suffered from a mental impairment that significantly interfered with daily functioning, that no referral for psychiatric or psychological treatment had been made, and no medication was prescribed for a mental impairment (Tr. 766).  X-rays of the lumbar

spine from June 23, 2004 show no significant change from the March 24 study (Tr. 764).

Dr. Garcia-Bengochea noted results from a CT scan on July 9, 2004, of the lumbar spine

with sagittal and coronal reconstructions demonstrated a satisfactory appearance of the

spine post-operatively with apparent resolution of a pseudoarthrosis (Tr. 760).  On August

25, 2004, Dr. Garcia-Bengochea again filled out a form for the Division of Disability

Determinations, on which he stated Plaintiff had mild to moderate paravertebral muscle

spasm with a slight antalgic gait and an inability to squat (Tr. 759).

**Drs. Edward Lee, M.D., and Robert Ponte, M.D., Parkside Surgery Center**

Dr. Garcia-Bengochea referred Plaintiff to Dr. Edward M. Lee for a consultation on

June 2, 2000 (Tr. 313-15).  During the consultation, range of motion (ROM) testing to the

cervical spine was normal and range of motion to lower back revealed no pain with flexion

and some pain at extreme of extension (Tr. 314).  Additionally the ROM revealed no pain

with lateral bending and axial rotation (Tr. 314).  On June 14, July 6, and July 19, 2000, Dr.

Lee and Dr. Ponte performed lumbar epidural steroid injections (Tr. 317-18, 321-22, 323-

24) which appeared to provide some relief (Tr. 321).  On September 11, 2000,  Plaintiff

underwent a provocative lumbar discography at L3-4, L4-5, L5-S1, which revealed he had

a painful degenerated L5-S1 disc with the appearance of a disc bulge within the posterior

epidural space at L5-S1 (Tr. 291-301).  A CT scan confirmed central and left posterolateral

L5-S1 disc protrusion (Tr. 295).

**Gaston J. Acosta-Rua, M.D., F.A.C.S.**

Dr. Waters referred Plaintiff to Dr. Acosta-Rua for evaluation, who saw Plaintiff on

August 16, 2001 (Tr. 357).  From his examination on that date, Dr. Acosta-Rua noted that

Plaintiff had a full range of motion in the back and that the straight leg raising test was

negative at 70 degrees bilaterally (Tr. 357).  Dr. Acosta-Rua's impression was that Plaintiff had failed back syndrome (Tr. 357).  Dr. Acosta-Rua's review of the August 22, 2001 MRI of the lumbar spine revealed what appeared to be a recurrence of disc herniation at L5-S1 (Tr. 355).   The MRI demonstrated abnormal soft tissue signal intensity in the left anterolateral aspect of the spinal canal with obliteration of the epidural fat at L5-S1 level and no evidence the thecal sac nor the nerve roots were deformed at that level (Tr. 356).

**Margaret J. Ripley, M.D., P.A**.

Dr. Waters also referred Plaintiff to Dr. Ripley for a consultation regarding Plaintiff's knee injury and the subsequent ACL reconstruction performed in May of 1998 (Tr. 358). Dr. Ripley saw Plaintiff on  September 6, 2001.  In a letter to Dr. Waters, dated that same date, Dr. Ripley stated she found Plaintiff's range of motion was zero to one hundred forty degrees (0 to 140°),  he had a negative Lachman, a negative anterior drawer, and a negative bounce test, but a slightly positive pivot shift (Tr. 358).  Dr. Ripley also noted Plaintiff had 2+ crepitation in the right knee and was tender in the retropatellar area (Tr. 358).  Dr. Ripley started Plaintiff on Celebrex, ice, a knee sleeve with a patellar cut-out and VMO strengthening exercises (Tr. 358).  The September 6, 2001 letter is the only evidence from Dr. Ripley in the record.

**Mark A. Spatola, M.D., Northeast Florida Neurosurgery**

Plaintiff saw Dr. Spatola for a neurosurgical consultation on October 4, 2001 (Tr. 359-60).  During the evaluation, Dr. Spatola found negative straight leg raising and good lumbar flexion and extension (Tr. 360).  Dr. Spatola noted that Plaintiff was currently working a job in lawn service (Tr. 360).  After reviewing MRI films and reports, as well as Dr. Garcia's and Dr. Acosta-Rua's notes, Dr. Spatola found the MRI showed degenerative

disc disease and enhancing left-sided material, soft tissue at L5-S1 consistent with granulation tissue with no neurological compression (Tr. 359-61).  He also noted that the etiology of the pain is unclear whether there is nerve damage, whether it is due to granulation tissue, whether it could be muscular in origin, or it could be due to mild mechanical instability (Tr. 361).  The October 4, 2001 letter is the only evidence from Dr. Spatola in the record.

**Dr. Christopher Roberts, M.D., The Jacksonville Spine Center**

On November 28, 2001, Plaintiff presented to Dr. Roberts, who diagnosed chronic low back pain most likely related to lumbar degenerative disease at L5-S1 with probable secondary facet arthropathy and probable secondary mechanical lumbosacral strain (Tr. 430).  Dr. Roberts performed two lumbar facet injections under fluoroscopy, one on January 11, 2002 (Tr. 427) and one on January 18, 2002 (Tr. 425).  Plaintiff underwent bilateral L4-5 and L5-S1 radiofrequency lesioning under fluoroscopy on February 28, 2002, performed at Baptist Hospital by Dr. Roberts (Tr. 616-17).

**Dr. Luis Mojicar, M.D., Anchor Plaza Family Practice Center**

Medical records show Plaintiff was seen by Dr. Mojicar from May to June 2004 (Tr. 837-42).  On September 17, 2004, Dr. Mojicar completed a Treating Source Mental Health Report at the request of the Division of Disability Determinations (Tr. 835-36).  Dr. Mojicar found Plaintiff's mood and affect were within normal limits except for anxiety episodes secondary to chronic back pain syndrome, his thought process and content were within normal limits, and his concentration, orientation, and memory within normal limits (Tr. 835).  Dr. Mojicar also determined that Plaintiff had no hallucinations or perceptual disturbances and his behavioral observations were within normal limits (Tr. 836).  He further noted

Plaintiff was not capable of sustaining work activity for eight hours a day, five days a week due to his chronic back pain secondary to multiple surgeries (Tr. 836).

**Dr. Andrea Trescot, M.D., The Pain Center**

The record contains treatment notes from Dr. Trescot for three office visits with Plaintiff dating April 28, 2005 to June 7, 2005 (Tr. 858-64).  On April 28, 2005, Dr. Trescot diagnosed sacroiliac pathology, lumbar post laminectomy syndrome, low back syndrome, and limb pain (Tr. 864).  On that date, Plaintiff was given a prescription for Fentanyl patch[5] to be reapplied every seventy-two hours and a prescription for Percocet 10/325 to be taken every twelve to twenty-four hours as needed (Tr. 864).  A cervical spine MRI on June 2, 2005 revealed mild spinal stenosis with mild impression on the spinal cord with left neural foramina narrowing and central disk bulge and protrusion at C6-7, moderate disk bulge at C3-4, and mild disk bulge C4-5 (Tr. 861).  On June 7, 2005, Plaintiff underwent a sacroilliac joint injection with arthrogram under fluoroscopy (Tr. 859).

Dr. Trescot completed a Questionnaire to Physician-Pain form on May 23, 2006 (Tr. 866-68).  She stated Plaintiff had constant moderate to severe pain with activity, evidenced by muscle spasms and reduced range of motion (Tr. 866).  Dr. Trescot noted Plaintiff described difficulty concentrating while reading and Plaintiff had limited social activities (Tr. 868).  In determining Plaintiff's limitations, Dr. Trescot deferred to a Functional Capacity Evaluation completed on May 19, 2006 by a Brooks Rehab Network physical therapist (Tr. 867).  Dr. Trescot indicated that Plaintiff should not work because activity causes an

---

[5]A Fentanyl patch is the generic form of the Duragesic patch, which is a narcotic (opioid) pain medicine.  *See* http://www.drugs.com/duragesic.html (last visited September 28, 2008).

14

increase in pain resulting from a failed fusion and persistent neck pain (Tr. 868).

The Functional Capacity Evaluation, upon which Dr. Trescot relied, was completed by Anita L. Davis, a physical therapist at Brooks Rehab on May 19, 2006 (Tr. 869-75).  Ms. Davis reported that Plaintiff gave reliable efforts in going through the evaluation, which included completion of a questionnaire, dynamic lifting of weighted objects, dynamic non-material handling work activities (such as squat, reach-up, reach-out, bend, climb, and stoop), observable work postures (such as sitting, standing and walking), and physical findings including grip strength and positions (Tr. 869-75).  Ms. Davis determined Plaintiff's current work capacity (i.e. on May 19, 2006) was characterized by the Light Physical Demand Level (Tr. 875).  She noted Plaintiff was able to reach consistently with no restrictions; bend, negotiate steps, stand and walk frequently; squat, stoop and sit occasionally; and, was able to lift/carry up to twenty-six (26) pounds occasionally (Tr. 869-875).

## ANALYSIS

Plaintiff raises five main issues on appeal.  First, Plaintiff alleges the Commissioner improperly evaluated Plaintiff's musculoskeletal impairments (P's Brief at 15).  Second, Plaintiff argues the Commissioner improperly evaluated Plaintiff's pain (P's Brief at 18).  Third, Plaintiff contends the Commissioner failed to properly evaluate Plaintiff's RFC (P's Brief at 20).  Fourth, Plaintiff alleges the Commissioner improperly evaluated Plaintiff's mental impairments (P's Brief at 22).  Fifth, Plaintiff argues the Commissioner failed to accord proper weight to Plaintiff's treating medical providers (P's Brief at 25).  Overall, Plaintiff contends the ALJ's decision to deny disability benefits is not supported by substantial evidence (P's Brief at 26-27).

Defendant argues the ALJ's decision is supported by substantial evidence.  More specifically, Defendant contends Plaintiff failed to carry his burden of establishing that his musculoskeletal condition met a Listing, the ALJ properly evaluated Plaintiff's pain in accordance with Eleventh Circuit case law, the ALJ properly evaluated Plaintiff's RFC, Plaintiff failed to carry his burden of establishing that he had a severe mental impairment prior to September 30, 2004, and the ALJ accorded proper weight to Plaintiff's treating sources opinions (*see generally* D's Brief).

## I. Plaintiff's Musculoskeletal Impairments

Plaintiff alleges the medical evidence in the record establishes that Plaintiff's musculoskeletal impairments met Listing 1.04A.

> Listing 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) requires the disorder to result in the compromise of a nerve root or the spinal cord, evidenced by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight-leg raising test (sitting and supine).  20 C.F.R. Pt. 404, Subpt. P.App. 1.

As previously noted, Plaintiff bears the heavy burden of proving he is disabled.  20 C.F.R. § 404.1512(a); *Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990).  A claimant may satisfy the burden of proving disability if he or she shows that the claimed  impairment or impairments meet or equal a listed impairment.  *Lucas v. Sullivan*, 918 F.2d at 1571. The evidentiary standards for presumptive disability under the Listings are stricter than for

cases that proceed to other steps in the sequential evaluation process because the Listings represent an automatic screening in based on medical findings rather than an individual judgment based on all relevant factors in a claimant's claim.   *See* 20 C.F.R. § 404.1520(d). As the U.S. Supreme Court stated in the case of *Sullivan v. Zebley*, "For a claimant to show that his impairment matches a listing, *it must meet all of the specified medical criteria.* An impairment that manifests only some of those criteria, no matter how severely, does not qualify."   *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added).

Plaintiff contends various medical tests, procedures, and diagnoses described in the record support finding his impairment meets the Listing.   Specifically, Plaintiff first points to an MRI of the lumbar spine on May 26, 1999 that "revealed degenerative disc disease at L5/S1, and a broad based left paracentral disk protrusion impinging the left proximal S1 nerve root and compression of the S1 nerve root" as evidence (P's Brief at 16).   However, Plaintiff's statement of the MRI results is inaccurate.   The May 26, 1999 MRI revealed "degenerative disk disease at the L5/S1 level.   In addition, at this level, there is a broad-based left paracentral disk protrusion, which is touching the left proximal S1 nerve root" (Tr. 217).   There is no mention of nerve root compression.

Plaintiff also mentions the following procedures as evidence his impairment equals Listing 1.04A: microendoscopic diskectomy performed on January 4, 2001; bilateral L4-5 and L5-S1 radiofrequency lesioning under fluoroscopy on February 28, 2002; an anterior cervical microdiskectomy with allograft fusion on July 12, 2002; a posterior lumbar interbody fusion with segmental fixation on October 10, 2002; and anterior diskectomy with

osteotomies and removal of previous pseudoarthrosis[6] and anterior lumbar interbody fusion at L5-S1 on December 1, 2003 (P's Brief at 17-18).  Plaintiff fails to demonstrate how medical procedures are evidence of the criteria set forth Listing 1.04A.

Plaintiff also contends the following diagnoses reflect Plaintiff's impairment meets the criteria of Listing 1.04A: painful degenerative disc disease at L5-S1 on September 11, 2000; L5-S1 herniated nucleus pulposus disc, central and left side, producing discogenic pain and possible radiculopathy on January 4, 2001; chronic lower back pain, most likely related to lumbar degenerative disc disease at L5-S1 with probable facet arthropathy and probable secondary mechanical lumbosacral strain on November 28, 2001; and status post posterior lumbar interbody fusion with probable pseudoarthritis[7] at L5-S1 on December 1, 2003 (P's Brief at 17-18).   Notwithstanding the list of diagnoses, Plaintiff ignores established jurisprudence that a diagnosis is an insufficient basis for finding that an impairment is severe. *Sellers v. Barnhart*, 246 F.Supp.2d 1201, 1211 (M.D. Ala. 2002); *see also McCray v. Massanari*, 175 F.Supp.2d 1329, 1334 (M.D. Ala. 2001) (where the district court found the claimant must provide more than evidence of a listed diagnosis to prove disability under one of the listed impairments).

Here, review of the record reveals the medical evidence submitted by Plaintiff does not include any diagnosis or evidence of nerve root compression.  Without evidence of nerve root compression, Plaintiff cannot establish that his condition meets the criteria of

---

[6]The Court notes Plaintiff refers "probable pseudoarthritis at L5-S1" (P's Brief at 17), although throughout the record references are made only to "pseudoarthrosis."

[7]Again, the Court notes Dr. Garcia-Bengochea diagnosed "probable pseudoarthrosis," not pseudoarthritis (Tr. 594).

Listing 1.04A.  Furthermore, the evidence does not satisfy the required showing of limitation of motion of the spine, motor loss, or positive straight-leg raising tests, and Dr. Garcia-Bengochea responded to a questionnaire in August 2004 in which he noted "none" to the inquiry asking what degree of any loss of motion and/or deformity of the major joints did Plaintiff experience (Tr. 759).  Dr. Garcia-Bengochea further noted Plaintiff had mild to moderate paravertebral spasm, but did not report any loss of motion of the spine or any associated sensory, motor, or reflex deficits (Tr. 759).  Thus, the Court agrees with Defendant that Plaintiff has not met his burden of demonstrating his condition meets or equals an impairment Listing during the relevant period.

## II. Plaintiff's Subjective Symptoms of Pain

Plaintiff alleges the ALJ erred by failing to conclude his pain satisfied the pain standard in this circuit (P's Brief at 19).  Plaintiff further contends since his subjective testimony is supported by medical evidence that satisfies the pain standard, it is itself sufficient to support a finding of disability (P's Brief at 20).[8]

The Eleventh Circuit pain standard requires evidence of an underlying medical condition, and either objective medical evidence that confirms the severity of the alleged pain arising from that condition, or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).  "After considering a claimant's complaints of pain, the ALJ may reject them as not credible, and that determination will be reviewed

---

[8]Plaintiff relied heavily on Dr. Trescot's opinion as medical evidence supporting his subjective complaints of pain.  However, the ALJ properly discounted Dr. Trescot's opinion as it was formed after the date last insured and objective medical evidence did not support her findings (Tr. 21-22).

for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) (citing *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984)); *see also Cartwright v. Heckler*, 735 F.2d 1289, 1290 (11th Cir. 1984) (finding the credibility of a claimant's testimony is the duty of the Commissioner).

Additionally, the Regulations state that when the medical signs or laboratory findings document a medically determinable impairment that could reasonably be expected to produce the pain alleged, the Commissioner must then evaluate the intensity and persistence of the pain to determine how it limits the claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1).

Plaintiff testified he goes on short bike rides, plays catch with his daughter, and takes his children to school (Tr. 911-12, 914).  The ALJ found these daily activities do no comport with an individual suffering from disabling pain.  *See* 20 C.F.R. § 404.1529(c)(3) (pattern of daily living is an important indicator of the intensity and persistence of symptoms); *see also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (finding the ALJ may consider evidence regarding a claimant's daily activities during the fourth step of the sequential evaluation process).

The ALJ also noted the record reflects Plaintiff engaged in work activity after the alleged onset date (Tr. 20).  Plaintiff reported to Dr. Waters on April 13, 2001 that he took one to two Lortab tablets prior to going to work at his landscaping job (Tr. 469).  Although Plaintiff complained in October 2001 of renewed pain after returning to work for three months, he also reported the improvement in his impairment prompted him to try to return to work (Tr. 359-60).

Additionally, the ALJ found the record revealed Plaintiff's treatment was generally

20

successful in controlling his symptoms of pain (Tr. 20).   In spite of numerous medical

procedures, or perhaps because of them, Plaintiff reported improvement in his back pain

from before surgery (Tr. 770) and he was doing quite well without significant low back pain

in December of 2003 (Tr. 772).   Over and above this evidence, the ALJ points to the

findings of the Division of Disability Determinations reviewing physicians, which are in

accord with her RFC assessment of Plaintiff despite his subjective complaints of pain

documented in the record (see Tr. 21, 730-36, 827-34).

When an ALJ sets forth at least three reasons supported by substantial evidence to

discredit a plaintiff's subjective complaints of pain, a court may find the ALJ properly

discredited the subjective pain testimony.   *See Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th

Cir. 1989).   Here, the Court finds that the ALJ properly discredited Plaintiff's subjective

complaints of pain.

### III. Plaintiff's Residual Functional Capacity

Plaintiff alleges the ALJ failed to properly evaluate Plaintiff's RFC.   Specifically,

Plaintiff contends the ALJ failed to discuss the specific requirements of light work[9], including

standing, walking, sitting, reaching, postural requirements, and mental demands (P's Brief

at 21).   Plaintiff also asserts the ALJ failed to address the limitations arising from Plaintiff's

pain, including his testimony regarding his "better days" and "worse days," and medication

---

[9]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  20 C.F.R. § 404.1567(b).

side effects (P's Brief at 21).

Pursuant to SSR 96-8p, the ALJ in making an RFC assessment must identify the individual's functional limitations or restrictions and assess his or her work-related ability on a function by function basis.  SSR 96-8p, 1996 WL 374184 at *1 (S.S.A. 1996).  In so doing, the RFC assessment must address both the remaining exertional and non-exertional capacities of the individual.[10]   The RFC assessment must also include a narrative description of how the evidence supports each conclusion by discussing objective medical and other evidence, including the individual's complaints of pain, and medical source opinions. *Id.* at *7.

Review of the ALJ's decision demonstrates the ALJ complied with the requirements of SSR 96-8p.  In the instant matter, the ALJ addressed Plaintiff's functional limitations and the specific requirements of light work by stating  "[Plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds frequently. [Plaintiff] can stand and/or walk 6 hours and sit 6 hours in an 8-hour workday. [Plaintiff] can occasionally climb, balance, stoop, kneel, crouch, and crawl. [Plaintiff] must avoid working at heights" (Tr. 19).

Plaintiff's argument that the ALJ failed to address the mental demands of light work is unavailing.  First, Plaintiff did not claim a severe mental impairment kept him from performing work activity.   Second, the medical evidence Plaintiff submitted does not

---

[10]Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.  Nonexertional capacity consists of all work-related limitations and restrictions not encompassed in exertional capacity, including postural, manipulative, visual, communicative, and mental activities.  SSR 96-8p, 1996 WL 374184 at *5-6 (S.S.A. 1996).

indicate Plaintiff had any mental limitations in his ability to work during the relevant period. Third, the ALJ evaluated Plaintiff's diagnosed mental conditions in conformance with 20 C.F.R. § 404.1520a.

Plaintiff's allegation that the ALJ erred by failing to consider Plaintiff's testimony is equally without merit. The ALJ thoroughly discussed Plaintiff's testimony, including Plaintiff's statement that his medications caused "nothing major" in terms of side effects (Tr. 20, 906).[11] Furthermore, the ALJ properly considered Plaintiff's testimony and found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible (Tr. 20).

## IV. Plaintiff's Mental Impairments

Plaintiff argues the ALJ had sufficient medical evidence before her to conclude Plaintiff's mental condition was a severe impairment (P's Brief at 25).[12] However, Plaintiff's argument on this issue is misplaced (*see* P's Brief at 22-25). The question is not whether substantial evidence would support a finding of a severe mental impairment. The question is does substantial evidence support the finding that Plaintiff's mental impairment was not severe and was that finding determined through application of the correct legal standards.

---

[11]Though Plaintiff first testified he had no major side effects from his prescribed medications, Plaintiff later stated he would "forget little things" due to taking Xanax and "just being stressed out" (Tr. 906-07).

[12]Plaintiff also appears to argue the ALJ engaged in "sit and squirm jurisprudence" (P's Brief at 24). However, the Court finds this argument is wholly without merit. Plaintiff does not identify any facts supporting his position that the ALJ made clinical judgments about the presence of pain based upon a short one-time observation of the plaintiff at the hearing (P's Brief at 24). Additionally, this Court's independent review of the ALJ's decision reveals the ALJ did not make any clinical judgments.

As Plaintiff's subtitle to this section of his brief indicates (P's Brief at 22), the Court must determine whether the ALJ properly evaluated Plaintiff's claimed mental impairments.

To evaluate a claim of disability based on a mental impairment, the Commissioner is required to follow a special procedure set out at 20 C.F.R. § 404.1520a. Section 404.1520a (b)(2) provides the Commissioner must rate the degree of functional limitation resulting from the impairments in accordance with paragraph (c) of that section and must record the findings as set out in paragraph (e) of that section. Sub-paragraph (c)(4) requires the degree of limitation in the functional areas of daily living; social functioning; and concentration, persistence, or pace will be rated using a five point scale of: "None, mild, moderate, marked, and extreme" and the degree of limitation in the fourth functional area (episodes of decompensation), be rated using the four-point scale of: "None, one or two, three, four or more." Section 404.1520a (e)(2) provides in pertinent part that "[a]t the administrative law judge hearing [level]. . . the decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section."

The ALJ properly evaluated Plaintiff's mental impairments in accordance with Section 404.1520a. She determined Plaintiff's mental impairments during the relevant period caused no restrictions of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 19). Review of the record reflects the ALJ properly

considered and weighed all the evidence regarding Plaintiff's mental impairments.[13]   The

ALJ mentioned Plaintiff's hospitalizations at Ten Broeck and noted both of the admissions

were prior to the alleged onset date (Tr. 19).  The ALJ relied upon Dr. Garcia-Bengochea's

assessment indicating Plaintiff did not have a mental impairment that significantly interfered

with daily functioning, as well as Dr. Mojicar's assessment that Plaintiff's mental functions

were within normal limits (Tr. 19, 766, 835-36).  Additionally, the ALJ noted Plaintiff's own

statement to Dr. Waters denying he had any symptoms of depression or anxiety (Tr. 19,

513).   Although Plaintiff contends Dr. Trescot's opinion and Plaintiff's testimony at the

hearing support a finding of severe mental impairment, the ALJ properly considered and

gave little weight to Dr. Trescot's opinion as discussed in the next section and properly

discredited Plaintiff's testimony as discussed in section II.  Substantial evidence supports

the ALJ's finding Plaintiff's mental impairments were non-severe.

## V. Medical Opinions of Plaintiff's Treating Sources

As to Plaintiff's fifth argument, Plaintiff is correct that the ALJ failed to explicitly state

the weight accorded to the medical evidence from the following medical sources: Dr.

Ripley, Dr. Waters, Dr. Calhoun, Dr. Schott, Dr. Kilgore, Dr. Ponte, Dr. Lee, Dr. Acosta-

Rua, Dr. Spatola, and Dr. Roberts, in her decision to deny benefits (Tr. 10-23).  Typically,

that fact could be cause for remand.

---

[13]While Plaintiff correctly notes he was prescribed Alprazolam during the relevant period (Tr. 737-58), contrary to Dr. Garcia-Bengochea's mark on March 31, 2004 Division of Disability Determinations form that Plaintiff was not on any type of medication for a mental impairment that significantly interfered with daily functioning (Tr. 766), the record reveals Dr. Garcia-Bengochea never prescribed that medication (Tr. 737-58).  Thus, this inconsistency does not detract from Dr. Garcia-Bengochea's assessment of Plaintiff's mental functioning, given the information available to Dr. Garcia-Bengochea was based on his observations of Plaintiff and the other medical history Plaintiff provided.

The opinions and diagnosis of a treating physician are entitled to special deference under the Regulations and the law in this circuit. Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards v. Sullivan*, 937 F.2d at 583. In this case, however, examination of the medical records of the above-referenced physicians and the chiropractor reveals nothing in the evidence, including the treatment notes, provides support of Plaintiff's claims of *disabling pain* or *physical limitations beyond what the ALJ found*.

In fact, Dr. Waters and Dr. Calhoun did not put any restrictions or limitations on Plaintiff's ability to work and the ALJ specifically addressed the medical evidence from these treating physicians (Tr. 16-17, 438-579). Neither Dr. Lee nor Dr. Ponte placed any limitations or restrictions on Plaintiff's ability to work, and in the decision ALJ Anderson referred to the medical evidence from these doctors (Tr. 15, Exh. 8F; Tr. 291-324). Dr. Acosta-Rua did not provide an opinion as to Plaintiff's ability to work, but again the medical evidence was addressed (Tr. 16, 355-57). Dr. Ripley only saw Plaintiff once and did not

give an opinion as to restrictions or limitations on Plaintiff's ability to work, but ALJ Anderson nonetheless summarized this evidence (Tr. 16-17, 358).  The record contains only one document from Dr. Spatola, which does not indicate any restrictions or limitations on Plaintiff's ability to work (Tr. 359-61).  Dr. Roberts also did not give any opinions as to Plaintiff's ability to work (Tr. 423-31).  Dr. Schott is a chiropractor, whose opinion is not entitled to special deference or weight, although the ALJ did show consideration of the chiropractic treatment for Plaintiff's impairments (Tr. 15, 122-56).[14]  Further, all of Dr. Schott's treatment occurred prior to Plaintiff's alleged onset date and his opinion, as noted *supra*, states on the same form Plaintiff both can return to work and was totally incapacitated (Tr. 136).

In this case, there was no reason to discount the records of the aforementioned doctors, as that evidence is in accord of the other evidence of record and with the ALJ's findings.

The Court notes Dr. Kilgore's medical records included follow-up forms wherein restrictions on Plaintiff's ability to work were noted on March 10, 2000, October 21, 1999, and May 19, 1999 (Tr. 189- 240).  Using the same follow-up forms, Dr. Kilgore did not place

---

[14]The Regulations provide that evidence from acceptable medical sources is necessary to establish whether a claimant has a medically determinable impairment.  20 C.F.R. § 404.1513(a).  Acceptable medical sources include licensed physicians; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists.  *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a one of these providers unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 416.1527(d).

Evidence from other sources may also be used to show the severity or effects of a claimant's impairments.  20 C.F.R. § 404.1513(d). Other sources include, but are not limited to nurse-practitioners and chiropractors.  *Id.* Regardless of its source, the Commissioner will evaluate every medical opinion received.  20 C.F.R. § 404.1527(d).

any restrictions on Plaintiff's work activities on December 1, 1999, August 31, 1999, July 15, 1999, and March 24, 1999 (Tr. 189-240).  If an ALJ finds reason to discount a treating physicians opinion, he must articulate explicit reasons for doing so.  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).  Although it would have been preferable for the ALJ to have specifically discussed these on and off work restrictions set by Dr. Kilgore, on the facts of this case, the Court does not find that her failure to do so subtracts from the substantial evidence in the case.  The ALJ explicitly refers to Dr. Kilgore's treatment of Plaintiff (Tr. 15), thus demonstrating her consideration Dr. Kilgore's medical evidence.  Review of all Dr. Kilgore's treatment notes and other medical records on Plaintiff did not reveal any lasting or long-term restrictions were placed on Plaintiff's work activities.  On March, 10, 2000, the latest record from Dr. Kilgore, Plaintiff was seen by J. Daniel, ARNP with Dr. Kilgore's practice (Tr. 190-91).  The nurse-practitioner placed Plaintiff on no work status and referred him to Dr. Javier Garcia.[15]  Special deference to medical evidence from a nurse-practitioner is not required.[16]  All treatment by Dr. Kilgore and his staff occurred before Plaintiff's alleged onset date of disability.  Here, there is no reason to believe an explicit statement of weight given to Dr. Kilgore's medical evidence of Plaintiff's treatment would have changed the outcome of the ALJ's decision.

Various courts, including this one, have addressed harmless error with their findings.  In *Diorio v. Heckler*, 721 F.2d 726 (11th Cir. 1983), the court found harmless error when the ALJ made erroneous statements of fact, but applied the proper legal standard when

---

[15]The Court takes note that Dr. Javier Garcia and Dr. Javier Garcia-Bengochea are one and the same person.

[16]*See* discussion, note 14, *supra*.

considering the vocational factors in application of the GRIDS.  *Id.* at 728.  In *Wright v. Barnhart*, 153 Fed. Appx. 678 (11th Cir. 2005), the court noted though although the ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and normally failure to do so is reversible error, such failure was harmless error when correct application of the Regulations would not contradict the ALJ's ultimate findings.  *Id.* at 684.[17]  This Court found harmless error when the ALJ failed to discuss a treating physician's opinion, but even giving controlling weight to the opinion would not have changed the outcome.  *Parton v. Astrue*, No. 3:07-cv-63-J-TEM, 2008 WL 897094 (M.D. Fla. Mar. 31, 2008).  Such is the case here.

In *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989), the court found no principle of administrative law or common sense requires remand in quest of a perfect opinion unless there is reason to believe the remand might lead to a different result.  In *Ward v. Commissioner of Social Security*, 211 F.3d 652, 656 (1st Cir. 2000), the court held that while an error of law by the ALJ may necessitate a remand, a remand is not essential if it will amount to no more than an empty exercise.  Here, remand would amount to an empty exercise as the opinions contained in Dr. Kilgore's medical records are unsigned, prior to the alleged onset of disability, and not inconsistent with the Plaintiff's limitations assessed by the ALJ.

### CONCLUSION

For the foregoing reasons, the undersigned finds the decision of the ALJ that Plaintiff

---

[17]Unpublished opinions are not considered binding authority; however, they may be cited as persuasive authority pursuant to the Eleventh Circuit Rules.  11th Cir. R. 36-2.

is not disabled within the meaning of the Social Security Act is supported by substantial evidence.  The Commissioner's decision is hereby **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this Order and Opinion and, thereafter, to close the file.  Each party shall bear its own costs.

DONE AND ORDERED at Jacksonville, Florida this 30th day of September, 2008.

THOMAS E. MORRIS
United States Magistrate Judge

Copies to all counsel of record